**FILED**

JUN - 3 2004

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BERNT WALTHER VONGRABE** | VERIFIED COMPLAINT UNDER 42 USC |
| 887 SUGARHOUSE CT | § 1983 FOR DEPRIVATION OF CIVIL |
| PORT ORANGE, FL 32129 | RIGHTS, §§ 1985(2), 1985(3), 1986, |
| PLAINTIFF | CONSPIRACY, COMMON-LAW CONS |
| | AND EMOTIONAL DISTRESS |
| v. | CIVIL ACTION: |
| | JUDGE: |

**WILLIAM JEFFERSON CLINTON, former President**, in his individual capacity, 5 125th St., New York, N.Y. 10027, Tel. 212-348-8882

Harold McEwen Ickes, 1300 Connecticut Ave. NW, Suite 600, Washington, DC 2003

Donald L. Fowler, in his individual capacity and as Chairman of the DNC, address un

The Democratic National Committee, 430 S. Capitol St. SE, Washington, DC 20003

Dirk Edward Ziff, Ziff Brothers Investment Company, 153 East 53rd Street, 43rd Fl New York, NY 10022

Robert Ward, c/o Mayer, Brown 1675 Broadway, New York, N.Y. 100195820

Mayer Brown Rowe & Maw LLP 1909 K Street NW, Washington, DC, 20006-1101

John Does (1) through (3), whose identities are currently unknown

Dianne Feinstein, Senator for the State of California, in her individual capacity, 331 Hart Senate Office Building, Washington, DC, 20510, Tel. 202-224-3841

Barbara Boxer, Senator for the State of California, in her individual capacity, 112 Hart Senate Office Building, Washington, DC, 20510, Tel. 202-224-3553

Darrell Issa, Congressman for the 48th District of California, in his individual capacity,  211 Cannon House Office  Building, Washington, DC, 20515, Tel. 202-225-3906

Sprint Corporation Political Action Committee, 6450 Sprint Parkway, KSOPHN0212-2A454, Overland Park, KS 66251

Darren S. Weingard, 100 Spear St #930, San Francisco, CA, 94105

Julie A. Zamarripa, Treasurer, Sprint Corporation Political Action Committee, 6450 Sprint Parkway, KSOPHN0212-2A454, Overland Park, KS 66251

Gary D. Forsee, Chairman and CEO Sprint Corporation, 2330 Shawnee Mission Parkway, Westwood, KS 66205

Daniel Pascucci, 12390 El Camino Real, San Diego, CA 92130

The Principals of Fish & Richardson, 12390 El Camino Real, San Diego, CA 92130

John Does (4) and (5), whose identities are currently unknown

DEFENDANTS

_Vertical text in right margin:_ CASE NUMBER 1:04CV00910 / JUDGE: Ellen Segal Huvelle / DECK TYPE: Civil Rights (non-employmen) / DATE STAMP: 06/ /2004

JURY ACTION

## Summary

The case presents two incidents of bribery of public officials quid pro quo for favors, i.e. the exertion of undue influence upon sitting judges to obtain favorable verdicts.

### The Ziff Case

Plaintiff in 1990 sold a profitable company, Redwood Press GmbH, a German corporation registered in Munich, and owned by plaintiff and his family, to Ziff Davis Publishing Company of New York for $2 million. Pending payment of the purchase price, on demand of buyer, plaintiff advanced an additional approx. $120,000 operating cost that he borrowed from his bank.

Buyer never paid the purchase price and reimbursed plaintiff for only $50,000 of the advance, leaving plaintiff with liabilities including interest to his bank exceeding $100,000.

The buyer resold Redwood to Softbank, a Japanese Investor, for over $100 million.

Plaintiff sued. To block plaintiff's access to the courts, the defendants over a period of several years paid bribes to the Clinton campaign. In return, members of the Clinton administration called the presiding judge in the case, freshly appointed by then President Clinton, and put pressure on her to dismiss the case. An analysis of the timeline (page 8) shows a strong positive correlation between bribes and adverse decisions in that case.

### The Sprint case

Plaintiff is a stockholder of Sprint Corporation. Caused by a relative minor incident that would have been brought in Small Claims Court, were it not for Sprint's malicious defense tactics, plaintiff discovered that Sprint over a period of 18 years had engaged in fraudulent conduct, was fined on multiple occasions a total of at least $10 million, and had settled dozens of class actions based upon deception, totaling over $100 million, all at cost to stockholders. In the ensuing litigation Sprint's attorneys engaged in massive perjurious conduct and paid elected official quid pro quo for interferences with due process.

### Conclusion

In both cases, linked by actors, venue, and basis in law, the defendants conspired to block plaintiff's meaningful access to the courts.

## 1.    Introduction

1.      This case presents the question whether it is proper for an elected official upon request of a litigant – and payment of sums of money quid pro quo – to conspire to block an adversary's meaningful access to courts in violation of <u>42 U.S.C. 1983, 1985(2)(3), 1986</u>.

2.      This case further, and inter alia, presents the question whether Noerr-Pennington, or certain state laws such as §§ 47(b)(2) and 425.16 of California's Code of Civ. Proc. violate the Constitution's Supremacy Clause by granting privilege for <u>conduct</u> violating a litigant's civil rights under the First, Fifths and Fourteenth Amendment to the Constitution.

## A.    Jurisdiction and Venue

3.      This Court has jurisdiction under 28 U.S.C. 1331, 1343, 1350, 1367 and 18 U.S.C. 1965. Venue is proper under 28 U.S.C. 1391(b)(2) as all of the actions complained of originated within the District. Jurisdiction of this court for the pendent claims is authorized by Rule 18(a) F.R.C.P. and arises under the doctrine of pendent jurisdiction as set forth in <u>UNITED MINE WORKERS v. GIBBS</u>, 383 U.S. 715 (1966).

## B.    Leading Theories of Complaint

4.      42 U.S.C. 1983, 1985(2)(3), 1986; plaintiff may, but does not yet, rely on the Federal Tort Claims Act under which a claim in the Ziff matter has been submitted both to the Whitehouse and the DOJ on February 2, 2002, to which neither responded.

## C.    Parties

5.      <u>Plaintiff</u> is a resident of the State of Florida. He was the founder and, together with his family, including his seven children, the owner of Redwood Press GmbH, a German company, that he sold to Ziff Davis Publishing Company of New York.

6.      Plaintiff is furthermore a researcher in the areas of biogenesis and gerontology and has placed numerous inventions into the public domain, including but not limited to US Patent Applications: 60/269,743 Bioartificial Organ and method for formation thereof (see FN 5); 60/268,276 Biocompatible porous matrix for organ genesis; 60/273,707 Formulation . . . for treatment of atherosclerotic diseases and HDL related disorders; 60/273,399 Improved Formulation . . . for the treatment of early Alzheimer and Senile Dementia.

7.      In 1977, he transferred his invention 'Spectrum Manipulated Packet Transmission', a technology used today in homeland security applications, to a Government agency at no cost to the agency, proving his loyalty as public citizen.

8.      The defendant William Jefferson Clinton is a former president of the United States, and resided at all times material hereto within the District of Columbia. He participated knowingly in, and approved of, Harold Ickes', the DNC's Donald L. Fowler's, Ziff's and Mayer, Brown's conspiracy to collect money in violation of the law, by promising favors for bribes disguised as political campaign contributions.

9.      The defendant Harold Ickes was a Lawyer for the Teamsters and other Unions, including Unions affiliated with organized crime. He was at all times material hereto Assistant to the President and Deputy Chief of Staff of the Clinton administration and worked and acted within the District of Columbia until he was discharged from his position in 1997.

10.     The defendant Dianne Feinstein is one of the Senators of the State of California; her place of work is located within the District of Columbia, where all of her actions originated.

11.     The defendant Barbara Boxer is one of the Senators of the State of California. Her place of work is located within the District of Columbia, where all of her actions originated.

12.     Darrell Issa is a Congressman for the 48th District of California; his place of work is located within the District of Columbia, from where all of his actions originated.

13.     The Democratic National Committee ("DNC") has its offices in Washington, D.C.; it was the beneficiary of bribes made by Dirk Ziff, Daniel Ziff, and Ziff Brothers Investment and others on behalf of Ziff (hereinafter called "Ziff"); its officers, knowing of the nature of the Ziff donations, accepted said bribes, and thereby participated in the conspiracy with Clinton and Ickes. In like or similar context, the DNC engaged in, and was fined at least $70,000 for, campaign finance violations.

14.     Donald L. Fowler was at all times material hereto the Chairman of the DNC and knew of the arrangements between Ickes and Ziff, and the nature of the funds collected.

15.     Mayer Brown Rowe & Maw LLP ("MBRM" or "Mayer Brown"), formerly known as Mayer, Brown, and Platt, is a law firm with offices in Washington, D.C.; plaintiff will prove at

trial that partners of MBRM set up the bribery scheme and/or were involved in arranging the payment of bribes to the DNC for the benefit of Bill Clinton.

16.     Robert Ward was at all times material hereto a principal at MBRM, was Ziff's defense counsel, and is believed to have initiated the contacts between Ziff, Clinton, Ickes and Fowler.

17.     Gary Forsee is the CEO and Chairman of Sprint Corporation; he knew about the Sprint PAC conspiracy to bribe elected officials, that is forming the basis of this action, but continued to facilitate it by inaction.

18.     Sprint Corporation Political Action Committee is Sprint Corporation's lobbying arm.

19.     Darren Weingard is in-house attorney for Sprint, and Julie A. Zamarripa, is the Treasurer of Sprint PAC.

20.     Daniel Pascucci is a partner at Fish & Richardson whose partners knowingly let him engage in a conspiracy to impede plaintiff's civil rights despite an obligation under 42 U.S.C. 1986 to prevent such conspiracy.

21.     Dirk Edward Ziff is one of three brothers owning Ziff Brothers Investment of New York. He is alleged to have bribed elected officials in the Clinton administration quid pro quo for favors, i.e. to put pressure on a federal judge to rule against plaintiff.

22.     Plaintiff reserves the right to move for leave to amend and/or join as soon as the identities of John Does, currently unknown, have been established.

**D.     Plaintiff's Health Conditions**

23.     Plaintiff underwent open heart surgery in 1992 and was diagnosed in 1997 by two United States government physicians at the Naval Hospital in Camp Pendleton to suffer from unstable angina, also known as ischemia. That condition has been described in detail in the June 1996 issue of the Journal of the American Medical Association (JAMA).

**E.     Physiology of Ischemia**

24.     Ischemia is the result of an abnormality of the circulatory system caused by the partial blockage of the cardio-vascular structure by plaque or other foreign matter. The acute phase is aggravated by the involuntary release of Adrenalin (Epinephrine), as in the

case of mental stress, causing the heart to pump at an accelerated rate, resulting in an increase of blood pressure placing further demand on the constricted vessels and increasing the risk of ruptured plaque. It is followed by episodes of severe chest pain.

25.     Plaintiff will prove at trial by expert testimony that ischemia is a sign of an impending heart attack[1] and therefore especially frightful for the patient[2]. The events, forming the basis for the Ziff suit, and the actors involved, severely troubled plaintiff and he began repeatedly to experience aggravation, anguish, fright, terror, apprehension, anxiety, worry, nervousness, and humiliation, followed by severe and repeated chest pains requiring emergency medication.

## 2.     Relevant History

### A.     The ZIFF case

#### i.     Background

26.     While on assignment in Germany, plaintiff in 1990 sold a profitable company, Redwood Press GmbH ("Redwood"), a German corporation registered in Munich, and owned by plaintiff and his family, to Ziff Davis Publishing Company of New York ("Buyer") for $2 million.

27.     Pending payment of the purchase price, on demand of buyer, plaintiff advanced an additional approx. $120,000 operating cost that he borrowed from his bank.

28.     Buyer resold Redwood in 1993 to Softbank of Japan for $100 million in profits.

29.     Yet buyer never paid the purchase price and reimbursed plaintiff for only $50,000 of the advance leaving plaintiff with liabilities including interest to his bank exceeding $100,000, plunging plaintiff and his family into poverty.

---

[1] The Merck Manual of Medical Information, 2nd Edition, 2003, p203: Unstable Angina refers to angina in which the pattern of symptoms changes. Because the characteristics of angina in a particular person usually remain constant, any change – such as more severe pain, more frequent attacks, or attacks occurring with less exertion, or at rest – is serious. Such change usually reflects a rapid progression of coronary artery disease, with an increasing narrowing of a coronary artery . . . The risk of a heart attack is high. Unstable angina is a medical emergency.

[2] When plaintiff discovered the connection between the Ziff case and the abuse of power by elected high ranking officials, he became so frightened that he posted some 1200 documents of evidence on an offshore server and activated a dead man switch that automatically releases the evidence to 1487 news organization if he fails to access the Internet, and enter a password, within 24 hours plus a four hour grace period.

### ii.    **Relevant Facts Ziff 1**

30.    Plaintiff sued from Germany, but for three years was unable to even get a response from the court (SDNY). Therefore, in 1994 he finally returned to the U.S. from where he attempted to accelerate the proceedings.

31.    There, the Reagan appointed presiding judge was suddenly removed from the case, no party having asked for it (or so it appeared), and replaced by Clinton appointed Judge Denise Cote.

32.    The newly appointed judge ordered plaintiff not to conduct discovery, found that it was premature to plead matters of conflict of laws, then converted a motion to dismiss sua sponte into one for summary judgment in favor of defendants, finding that plaintiff had failed to plead matters of conflict of laws and therefore applied New York law instead of German law to which the parties expressly had stipulated. The judge then marked her decision as unfit for publication.

33.    It was not until the Fall of 1999 that plaintiff seriously suspected that the judgment was the result of a bribery scheme that originated during an overnight visit of Dirk Ziff at the Whitehouse where he slept in the Lincoln Bedroom[3].

34.    However, not before the year 2000 did plaintiff find actionable evidence that showed that during the pendency of the NY-proceeding, under a scheme developed by Harold Ickes and initiated by Robert Ward of Mayer, Brown and Platt, one or more members of the Ziff family paid a total of $661,000 bribes, disguised as campaign contributions, to the Democratic National Committee to be used for defendant Clinton's reelection; on instruction of Harold Ickes, such payments were made in installments, quid pro quo every time an adverse decision was made:

---

[3] Another overnight guest in the Lincoln Bedroom was financier Richard C. Blum, husband of Sen. Dianne Feinstein, the defendant in this action. Richard C. Blum and Dirk Edward Ziff are both co-investors in Overseas Private Investment Corp, also known as OPIC, a government guaranteed investment program.



In more detail, the payments were made as follows:

| Contributor | Date | Description | Amount |
|---|---|---|---|
| Dirk Edward Ziff | 12/17/1993 | **Payment to obtain access to Whitehouse** | $100,000.00 |
| | | Defendant Dirk Ziff sleeps in Lincoln Bedroom | |
| | | negotiates bribes with President Clinton & Ickes | |
| | 9/21/1994 | **Reagan appointed Judge replaced** | |
| Dirk Edward Ziff | 9/27/1994 | | $37,500.00 |
| Dirk Edward Ziff | 9/27/1994 | | $62,500.00 |
| | 12/28/1994 | **Order: Argument Conflict of Law premature** | |
| | 3/8/1995 | **Order denying Discovery** | |
| Ziff Communication/Robert Ziff | 4/24/1995 | | $20,000.00 |
| Ziff Communications/Dirk Ziff | 5/26/1995 | | $10,000.00 |

| | | | |
|---|---|---|---|
| Ziff Communications/Dirk Ziff | 6/26/1995 | | $10,000.00 |
| Ziff Communications/Dirk Ziff | 6/26/1995 | | $80,000.00 |
| Ziff Communications/Robert Ziff | 7/25/1995 | | $2,500.00 |
| | 11/20/1995 | **Conversion Motion to Dismiss/Summary Judgment** | |
| | 11/28/1995 | **Defendants learn of Dismissal** | $300,000.00 |
| | | **Appeal 2. Cir** | |
| Ziff Brothers Investment | 1/8/1996 | | $1,000.00 |
| Ziff Brothers Investment/Dirk Ziff | 2/12/1996 | | $1,000.00 |
| Dirk Edward Ziff | 2/23/1996 | | $10,000.00 |
| Ziff Brothers Investment/Dirk Edward Ziff | 4/22/1996 | | $1,000.00 |
| Ziff Brothers Investment/Dirk Edward Ziff | 4/22/1996 | | $1,000.00 |
| Ziff Brothers Investment/Dirk Edward Ziff | 5/22/1996 | | $500.00 |
| Ziff Brothers Investment/Dirk Edward Ziff | 5/29/1996 | | $1,000.00 |
| Ziff Communications/Dirk Ziff | 6/21/1996 | | $10,000.00 |
| Ziff Brothers Investment/Dirk Edward Ziff | 6/26/1996 | | $1,000.00 |
| Ziff Brothers Investment/Dirk Edward Ziff | 6/27/1996 | | $1,000.00 |
| Ziff Brothers Investment/Dirk Edward Ziff | 7/17/1996 | | $1,000.00 |
| | | **Petition for Certiorari** | |
| Ziff Brothers Investment/Dirk Edward Ziff | 9/19/1995 | | $1,000.00 |
| Ziff Brothers Investment/Dirk Edward Ziff | 9/19/1996 | | $1,000.00 |
| Ziff Communications/Daniel Ziff Student | 9/26/1996 | | $2,500.00 |
| Ziff Brothers Investment/Dirk Edward Ziff | 9/26/1996 | | $2,500.00 |
| Ziff Brothers Investment/Dirk Edward Ziff | 9/26/1996 | | $2,000.00 |
| Ziff Communications/Dirk Ziff | 9/26/1996 | | $1,000.00 |
| Total Bribes Paid (ZIFF 1) | | | $661,000.00 |

Source: The data provided herein is contained in the Federal Election Commission Data Base, the accuracy of which cannot reasonably be doubted (see page 11 for a continuation in part of defendant's bribery scheme)

35.    Plaintiff will prove at trial by expert testimony that, based upon the strong positive correlation between adverse decisions and payments alone, the likelihood that such payments had nexus to the decisions in this case is <u>over one trillion to one</u>, and therefore such payments were not innocent campaign contributions but bribes made to obtain favors.

36.    By bribing elected officials, defendants and their co-conspirators in cahoots with politicians have systematically blocked plaintiff's access to the courts, a civil right granted to every citizen of every civilized nation under the laws of nations and treaties, including the treaty between the United States and the Federal Republic of Germany.

37.    The motivation behind defendant Clinton's solicitation and acceptance of bribes disguised as contributions is best described in an article in the Washington Post by staff writers Ruth Marcus and Charles R. Babcock, published on February 9, 1997; Page A01, partially reproduced here:

> "On Oct. 13, 1995, President Clinton promised his own government that in exchange for federal campaign funds he would spend no more than the legal limit of $37 million during the upcoming 1996 primary election campaign. But even as he signed the vow—which ultimately netted him $13 million from U.S. taxpayers—the president was circumventing it. That very morning, at 8:30 a.m. in the White House Map Room, Clinton had hosted an intimate coffee for major donors to the Democratic National Committee, one of many such klatches the president would hold in the executive mansion.
>
> Under a plan quietly approved by the president and Vice President Gore a month earlier, the money bagged in these events was pumped directly by the DNC into pro-Clinton advertising. For all intents and purposes, the DNC became an extension of the Clinton-Gore campaign, allowing the president to spend an extra $44 million on television ads and effectively obliterating the spending cap. Clinton later would blame the DNC—"the other campaign, not

*mine"—for fund-raising abuses when, in fact, his operation and the party's*

*had been welded into one money machine".*

38.     In 1996 plaintiff's son joined the United States Marine Corps and was stationed in Camp Pendleton; wherefore plaintiff moved temporarily to Oceanside, California.

39.     Since the New York judgment had stripped plaintiff of all assets, including of his profitable publishing company, the $2 million purchase price for selling it, and the investment in his house, and had left him with significant liabilities to his banks and others, exceeding $100,000, plaintiff had no choice but to file for bankruptcy in the Southern District of California.

40.     There, in an admittedly naïve belief that his problem could be solved within the bankruptcy system, plaintiff on August 6, 1999 filed an adversary proceeding against Ziff.

41.     No sooner was the action in the Southern District of California filed, when defendants renewed their pattern of bribery payments to the DNC for the benefit of Clinton. The defendants kept their ex parte contacts and bribery secret. Thus plaintiff did not find out until May 2004, when he run a routine investigation of Sprint PAC activities and came across the following FEC records, totaling another $186,000:

| Payment Date | Amount | Payor | FEC Transaction Number |
|---|---|---|---|
| 08/06/1999 | | | Case Filed |
| 12/20/1999 | 25,000 | DZ | 20035104583 |
| 09/20/2000 | 30,000 | DAZ | 20036155177 |
| 09/20/2000 | 20,000 | DAZ | 20036153855 |
| 09/25/2000 | 10,000 | DZ | 20036153855 |
| 10/19/2000 | 45,000 | DAZ | 20036663990 |
| 10/19/2000 | 45,000 | DZ | 20036663990 |
| 11/16/2000 | 1,000 | DZ | 20036583236 |
| 03/29/2001 | | | Case Dismissed |
| 05/24/2001 | 10,000 | DZ | 21020081511 |
| Total | 186,000 | | |

Legend: DZ= Dirk Ziff; DAZ=Daniel Ziff; both Ziff Brothers Investments

Source: The data provided herein is contained in the Federal Election Commission Data Base, the accuracy of which cannot reasonably be doubted

42.    It is alleged that Senators Boxer and Feinstein, following the Clinton practice, contacted the Judge and attempted to influence him in favor of Ziff.  On March 29, 2001 plaintiff's adversary proceeding was dismissed on appeal, Judge Jones, a Clinton appointee, presiding.

43.    The practice illuminated here is widespread; according to one attorney, "in New York this is done all the time". In fact, the practice seems so widespread that, Daniel Pascucci  argued in pleadings that if parties would be allowed to litigate attorney misconduct, including perjury and bribery, "the entire judicial system would come to a grinding halt"[4], and claimed that the First Amendment, the Noerr-Pennington doctrine, and state law immunize perjury and bribery to influence the outcome of a court case (see infra §91 on pages 22/23).

### iii.    Damage

44.    Plaintiff as a direct result of defendants' unlawful actions in addition to the purchase price of $2.1 million, lost his top credit rating, and therefore is unable to get funding for his bio-artificial organ research, described in detail at vongrabe.com/liver.pdf, a project geared to benefit society[5]. Thus, the impact of defendants' unlawful conduct goes far beyond the damage to plaintiff.

## B.    The Sprint 1 case

### i.    Background

45.    In or about December of 2000, plaintiff, in reliance upon promises made by Sprint Corporation ("Sprint") and/or Sprint PCS ("PCS") in advertising fliers, and in

---

[4] The argument is flawed: a couple of significant jury awards would stop attorney misconduct and bribery of elected officials in a hurry.

[5] To illustrate this better, in the United States alone, every year 30,000 patients die of fulminant liver failure; that is the equivalent of two Boeing 747 filled with close to 300 people crashing every week. Plaintiff discovered a method to grow bio-artificial livers. Drs. Vacanti et al at MIT, using similar technologies, grew a liver, albeit the size of a dime. Plaintiff's method  overcomes the size limitation and delivers a near life size organ. Yet, because of Ziff's reckless disregard for the rights of plaintiff and the resulting destruction of his credit, funding for plaintiff's research is unavailable even in countries that traditionally have supported research in plaintiff's area of expertise.

reliance upon the use of the Sprint logo[6] and Sprint PCS service mark purchased a

Sprint PCS cell phone from a Target Department store, had it activated by PCS at

cost, and purchased an Equipment Replacement Agreement ("ERA") offered under

the Sprint PCS service and Sprint Corporation trademarks, promising to replace

plaintiff's equipment when lost, stolen, or damaged. Plaintiff relied on Sprint's offer.

46.     Sprint's ERA offer was made fraudulently; Sprint refused to honor it twice,

continued to charge plaintiff for services he could not use for months, and threatened

to charge an early termination fee in case plaintiff cancelled the contract.

47.     Plaintiff attempted to bring an action in Small Claims Court, but could not

because neither Sprint [Corporation] nor Sprint PCS, the trade and service marks

used in Sprint's offer, were registered to do business in California.

48.     Plaintiff provided management consultant services and directly depended on

his cell phone for communication with his clients. Desperate to maintain contact with

his clients, plaintiff was forced to purchase another cell phone from a competitor,

paid for the equipment, the activation charge, and entered into a required one year

service agreement, at total cost of approx. $600, bringing the total damage to

exceed $900, while Sprint continued to charge plaintiff for services that were useless

to plaintiff without working equipment.

49.     To recover the damages from PCS, plaintiff began to investigate and research

Sprint Corporation's background information and found a wealth of disturbing facts.

In particular, plaintiff found that his damages were caused by a persistent pattern of

fraud and deception:

> • From 1998 to 2000 Sprint Spectrum dba Sprint PCS misrepresented in
>
> advertisements area coverage. On or about July 6, 2000 the State of New
>
> York, Attorney General Elliot Spitzer, fined Sprint PCS the sum of $100,000.
>
> The fine is of public record. The fine diminishes the value of Sprint's assets,

---

[6] Sprint in SEC filings (10-K) claimed that the Sprint trademark and Rhombus was owned by Sprint
Corporation, though later pleaded in court that that statement was false and Sprint Communications
Company owned both the trademark and PCS service mark.

and therefore was ultimately paid by stockholders. Esrey and the Board were informed about the fine, yet unimpressed continued to agree to Sprint's or its agents' future fraudulent conduct.

- In or about 2001 Sprint PCS misrepresented to the California Public Utilities Commission ("PUC") the number of telephone numbers available to it. On or about August 3, 2001, the PUC fined PCS the sum of $200,000. The fine is of public record. Esrey and the Board were informed about the fine, yet unimpressed continued to allow Sprint's or its agents' fraudulent conduct.

- During the years 2000 through 2002 ASC Telecom, a subsidiary of Sprint, engaged in misleading conduct, thereby injuring consumers that misdialed 1-800-COLLECT. The Federal Communications Commission on September 23, 2002 fined ASC Telecom for "especially egregious" conduct the sum of $1.4 million. The fine is of public record. Esrey and the Board were informed about the fine, knew of the cause for it, yet did nothing to prevent future misconduct, and thereby continued to allow Sprint's or its agents' fraudulent conduct.

- Upon information and belief, during the years from 1987 through 2004 Sprint or its subsidiaries settled a minimum of 12 class actions, commenced for recovery of damages from fraudulent, deceptive, or otherwise injurious conduct at an estimated cost to Sprint, and its stockholders, of in excess of $100 million. Sprint's Class Actions are of public record. Esrey and the Board were informed about the settlements by Richard Devlin, Sprint's former General Counsel, and therefore knew of the causes for such class actions, knew of Sprint's or its agents' unlawful conduct, approved each and every one of such settlements, yet continued to allow Sprint's or its agents' fraudulent conduct leading to further class actions at the detriment to stockholders.

50.     Sprint's fraudulent conduct was open ended and continued with the following incidents:

- Encouraged by the inaction of its executives and Board, Sprint from 2000 to 2002 defrauded the United States General Services Administration by covertly and knowingly passing through to the government costs and fees exceeding amounts Sprint was allowed to charge. The total damage was in excess of $2 million. Sprint was caught and fined approximately $5.6 million. The fine is of public record.

- On May 5, 2004, the State of Florida fined Sprint Communications Company ("Sprint Communications"), a subsidiary of Sprint, the sum of $2.4 million for "slamming", i.e. the fraudulent switching of consumer's long distance telephone service from one supplier to another, here to Sprint, without knowledge and  permission by consumers.

51.    Plaintiff located in excess of 10,000 complaints of like or similar kind filed by Sprint customers with the Attorney Generals and Consumer Protection agencies of virtually every state, the FCC, and the FTC [7]. Such consumer complaints are believed to be the tip of the iceberg, the true number of complaints on file being closer to 100,000.

### iii.    Commencement of Action

52.    Enraged about Sprint's boldfaced deceptive practices, plaintiff resolved to recover damages not only for himself, but from Officers and Directors for the benefit of Sprint Corporation and its stockholders, and furthermore seek punitive damages, sufficient in size to deter future misconduct, 90% of which to be paid to a medical research facility, i.e. the University of California.

53.    Plaintiff as a stockholder of Sprint Corporation had standing to sue Sprint Corporation's executives and/or directors, or their respective insurers.

54.    Unable to obtain relief in Small Claims Court, in or about August 2001 plaintiff filed an adversary proceeding in the United States Bankruptcy Court for the Southern

---

[7] The name "Sprint" is used generic and stands for Sprint or its Subsidiaries, as Sprint's Executives deliberately use Sprint's trade or service marks in a confusing manner to mislead consumers as to the true entity they are dealing with.

District of California against Sprint Corporation, Sprint PCS and Cox Communications Company, dba Sprint PCS.

### iv.    Defendants' Conspiracies to Obstruct Justice

55.    No sooner was the lawsuit filed when defendants' agents began to conspire to systematically block plaintiff's meaningful access to the courts within the meaning of Title 42 U.S.C. 1985(2) and/or (3).

56.    In particular, Darren S. Weingard ("Weingard"), Sprint's in-house counsel, conspired for the said purpose with Sprint's counsel Hillary Arrow Booth ("Booth") during a time period beginning with her appointment and ending with her resig- nation, as will be described in detail in a moment.

#### a.    Defendants' Shell Games

57.    Booth answered the complaint as Sprint Spectrum ("Spectrum"), claiming that Sprint, Sprint PCS, and Cox Communications dba Sprint PCS had been sued in error, and that Spectrum, was the proper defendant.

58.    When it became apparent by her own admission that Spectrum was neither the offeror of the insurance plan nor had anything else to do with the events in litigation, and plaintiff voluntarily dismissed Spectrum as defendant, she delayed the litigation for one year by pleading there was no defendant. It required a court order to establish otherwise.

59.    Booth then pleaded that Sprint Telephony PCS, not Spectrum, as previously claimed, was the proper defendant and privy to the events.

60.    As it turned out, as of this day Telephony is not doing business and according to state records is an entity that "will do business" in California. Further investigation showed that Telephony is in fact Cox Communications PCS, the same company of which Booth had pleaded that it was sued in error.

#### b.    Counsel's 2.5 Years Refusal to Participate in Discovery

61.    Counsel in the Sprint case from 2001 through 2004 refused to participate in discovery. Defendants refused to answer meaningfully Requests

for Admission, Written Interrogatories, and Requests for Production. As of this date, the Sprint defendants have not produced one single document.

### c.    Counsels' Misrepresentations of Material Facts

62.    In or about January of 2002 plaintiff filed a Motion for Leave to Amend Complaint and Join Parties in which he proposed to join Esrey and others. Counsel Booth opposed that motion claiming the individual defendants were residents of Missouri and had no contacts to the State of California.

63.    Counsel's statements were knowingly false.

64.    In the course of third-party discovery it was found that Esrey for over three years was a member of the Board of Directors of four companies, that were either California corporations, had their headquarters, or operated plants in California. Esrey regularly traveled to, and participated in, Board meetings within the state and influenced significantly the operation of such corporations, and thereby the economy of the state.

65.    The Court, in reliance on counsel's false statements, including false statements made into the face of the then sitting judge Jones, refused leave to amend and join.

66.    The damage is permanent. Esrey is a fugitive from justice, wanted by the IRS for tax evasion plus interest exceeding $100 million, has fled the country, and lives in Japan, a country believed to have no extradition treaty for tax evasion. He can no longer be reached to be held accountable..

### d.    Perjury Related to Jurisdiction over Sprint Corporation

67.    Far from having learned from her introduction of knowing false statements into the CASD proceedings, counsel Booth then turned around and promptly introduced a sworn affidavit of Executive Vice President Michael Hyde, the Hyde declaration, of which she knew that it was perjured, falsely claiming that Sprint Corporation did not do any business in California.

68.     Counsel again was warned that the content of the declaration was false, yet unimpressed continued to repeat the false statements.

69.     However, when it became clear that the issue would not disappear, she eventually confronted Weingard, the conceptual originator of the perjured document, and when Weingard insisted on continuing to misrepresent facts to the court resigned from the case and was replaced by Daniel T. Pascucci of Fish & Richardson.

70.     Pascucci - advised by Booth, Weingard, and plaintiff, that the Hyde declaration was perjured - continued using it in a hearing on December 16, 2002.

**v.      Statement of Relevant Facts Sprint 1**

71.     Plaintiff has personal knowledge of the fact that Pascucci through PACER had downloaded the Ziff dockets of the bankruptcy court and had studied the pleadings intimately. Upon information and belief Pascucci made the pleadings available to Weingard.

72.     Unsure whether its perjurious conduct in itself would be successful, Pascucci and Weingard decided to borrow a page from the Ziff case, agreed to conspire to bribe elected officials, and thus use the same obstruction of justice techniques employed in the Ziff cases

73.     For that purpose Weingard and Pascucci conspired with managers, or employees of Sprint PAC, including Julie A. Zamarripa, its Treasurer, instructing them to pay to Senators Feinstein, and Boxer, and Congressman Darrell Issa each $1,000 quid pro quo for contacting the presiding judges. They did as instructed:

76.     Plaintiff has copies of the FEC records in hand.

77.     The judge had been previously presented with sufficient evidence proving in detail that the Hyde declaration was knowingly false. That evidence was part of a Motion to take Judicial Notice and consisted of Government records, and copies of business records that had been created by authorized personnel of Sprint and its Subs in the ordinary course of business, the originals of which were in the custody of the Sprint defendants.

78.     However, as a result of the ex parte contacts by the Senator and the Congressman, the presiding judge in the CASD case carefully excluded all evidence proving the falsity of the Hyde declaration for "lack of foundation[8]" while accepting other documents of equal or lesser trustworthiness that were neutral to the perjury issue, effectively covering up the fact that Booth and Pascucci had introduced and used misrepresentation and a false sworn affidavit. <u>He then made the false Hyde affidavit the cornerstone of his findings</u> that he had no personal jurisdiction over Sprint Corporation.

79.     Having found that the court had no personal jurisdiction, the judge nevertheless dismissed with prejudice an 18 U.S.C. 1962(d) RICO claim against Sprint and its officers, effectively overruling <u>SALINAS v. U.S.</u> 118 S.Ct. 469 (U.S.Tex.,1997), 522 U.S. 52.

80.     The judge then overturned 36 precedents that allowed bad faith insurance settlement claims of like or similar kind in California, denying that plaintiff, who is the victim of insurance fraud and suffered injury to his property from bad faith insurance settlement practices, had standing to sue.

81.     The judge then found that plaintiff could not sue under section 1708 Cal. Civ. Code because he had served a Notice of Intent to File Lawsuit via Express Mail,

---

[8] It is well settled that to defeat a motion to dismiss, evidence does not have to be presented in the same fashion as on trial. All that is needed is to show that the non-moving party is entitled to present evidence at trial that proves his case.

Signature required, instead of serving it by Certified or Registered Mail, despite Section 1760 Cal. Civ. Code requiring liberal construction of 1708 claims and procedures to achieve the purpose of the consumer protection law, and despite admission by defendants that they in fact received the Notice.

82.     Under the impression of the Senator's and Congressman's ex parte contacts, the judge ignored a Motion for Sanctions based on defendants' perjurious conduct despite evidence in hand proving the allegation, effectively covering up Weingard's, Hyde's and Pascucci's perjurious conduct.

83.     On March 1, 2004, a few days before a hearing on a Motion to Dismiss, Sprint PAC made a payment to Senator Barbara Boxer:

| Date | Action | Amount | FEC # |
|------|--------|--------|-------|
| 3/1/2004 | Payment to Senator Barbara Boxer | 1,000 | 17950643 |

84.     Telephone records will show and plaintiff will prove at trial that between March 1, 2004 and March 11, 2004 the Senator in fact called the presiding judge and put pressure on him.

85.     After a hearing on March 11, 2003, the judge overturned another sixteen precedents, holding that plaintiff had no standing to sue under section 17200 of California's Business and Professional Code, effectively overruling CHABNER v. UNITED OF OMAHA LIFE INS. CO, 225 F.3d 1042, C.A.9 (Cal.), 2000; KNEVELBAARD DAIRIES v. KRAFT FOODS, INC., 232 F.3D 979, C.A.9 (Cal.),2000, and a minimum of 14 state cases.

86.     It is not clear why elected officials would possibly come to the rescue of a $100 million tax evader, protect corporate misconduct forming an 18-years pattern of fraud, cover up perjurious conduct, and argue against punitive damages, geared to deter future misconduct, 90% of which was to be paid to the University of California, an educational institution in the center of their respective districts.

87.     Whatever their motivation, by conspiring with the Sprint defendants and their respective lawyers, and by contacting the presiding judges ex parte and putting pressure on them, Senators Feinstein and Boxer, and Congressman Issa, they effectively blocked plaintiff's meaningful access to the courts, violated the separation of powers between the judiciary and the legislative branch, and furthermore violated plaintiff's rights under the First, Fifth, and Fourteenth Amendment of the Constitution, i.e. the right of access to the courts, the right to equal protection, and the rights under the privileges and immunities clause.

**vi.     Background Sprint 2**

88.     Severely aggravated by the court's failure not only to address issues of perjury, but to cover up perjurious conduct of Sprint's attorneys and agents in federal court, plaintiff brought an action against the conspirators, i.e. Weingard, Booth, Pascucci, and Hyde in the venue where the perjured affidavit was conceptualized, i.e. in San Francisco.

89.     No sooner was the complaint served, when Pascucci filed pleadings that on 14.5 pages contained 16 knowing false statements, added a sworn affidavit containing a material false statement, and finally submitted copies of misleading court documents, suppressing documents that showed the opposite of the core of his pleadings.

90.     In further submissions, Pascucci pleaded that he was entitled to lie into the face of sitting federal judges, submit perjured affidavits, misrepresent facts, or pay elected officials to interfere with the administration of justice, all of which under the First Amendment, the Noerr-Pennington doctrine, or §§ 47(b)(2) and 425.16 of Cal. Code of Civ. Proc.

91.     In particular, Pascucci pleaded in his <u>Memorandum of Points and Authorities in Support of Motion to Dismiss</u> ("<u>MD</u>") before the Northern District of California the following position (P=Page; L=Line):

MD **P8L20**   ". . . The Court need not assess the falsity of [defendants'] statements contained in their briefings and affidavits . . .because each Defendant is immune from liability for this conduct". (emphasis supplied)

MD **P9L3**   "This lawsuit, in its entirety, is barred by the Petition Clause of the First Amendment, which 'guarantees the right to petition the Government for redress of grievances'"

MD **P9L16**   "The FAC seeks to impose civil liability on the Defendants for making allegedly false statements, <u>suborn false statements</u>, in motions and oppositions to motions to the Southern District – all in defense of lawsuits brought against Sprint. These statements lie at the very core of that <u>which is protected by the First Amendment</u>" (emphasis supplied)

MD **P10L16**   "The allegations in the FAC are wholly insufficient to overcome the immunity that protects each of the acts complained of by the Plaintiff".

MD **P10L21**   "The California state corollary to the Noerr-Pennington doctrine is the litigation privilege, codified by Ca. Civ. [sic] Code §47(b)(2), which immunizes statements made in a judicial proceeding".

92.   Pascucci at all times material hereto knew that his position was untenable in light of <u>DENNIS v. SPARKS</u>, 449 U.S. 24 (1980); <u>KIMES v STONE</u> 84 F.3d 1121 (9th Cir 1996), holding that state law cannot bypass the supremacy clause; the Central District of California's case <u>GRITCHEN V. COLLIER</u>, 254 F.3d 807 (overruled on other grounds) holding that § 47(b)(2) was unconstitutional; and <u>CALIFORNIA MOTOR TRANSPORT v TRUCKING UNLIMITED</u>, 404 U.S. 508 (1972), holding that First Amendment rights may not be used as the means or the pretext for achieving "substantive evils" (citing <u>NAACP v. BUTTON</u>, <u>371 U.S. 415, 444</u> ).

### vii.   **Relevant Facts Sprint 2**

93.   Therefore, Pascucci, Weingard and John Doe, believed to be a member of Sprint PAC, conspired again to contact Senator Feinstein and ask the Senator again

to call the presiding judge in the Northern District case, put pressure on him, and ask him to block plaintiff's access to the court.

94.     The Senator was indeed the ideal instrument for interfering with plaintiff's rights, as she had been instrumental in the appointment of the CAND Judge to the federal bench by then President Clinton.

95.     As telephone records will show, the Senator, between February 9, 2004 and March 4, 2004, called the judge. Thereafter the judge, knowing of Pascucci's perjurious conduct, effectively blocked plaintiff's access to the court, disclosing unabashedly his bias, stating in public and on the record that plaintiff could not expect a fair trial before him, thereby greatly embarrassing himself and plaintiff.

96.     This result could have easily been avoided. On January 6, 2004 plaintiff had served upon **Gary Forsee**, the Chairman and CEO of Sprint Corporation, a Notice, delivered on January 3, 2004, followed by a notice addressed to the Board, in which plaintiff detailed Sprint PAC's involvement in the bribery scheme, requesting an investigation. Forsee refused to investigate and turned the Notice over to Fish & Richardson, the same attorneys that were themselves participating in the conspiracy.

97.     The inaction of Forsee encouraged the defendants to continue their conspiracy and to block plaintiff's meaningful access to the court.

98.     The sums paid as bribes to the Senators and Congressman were in the custody of Sprint PAC and controlled by its Treasurer **Julie A. Zamarripa**. The Treasurer had an obligation under a number of statutes, of which – without prejudice - 42 U.S.C. 1986 is relevant here, to deny illegal payment to elected politicians. Stopping payment of the illegal payments would have prevented success of the conspiratorial goal and thus prevent the conspiracy itself. Zamarripa neglected to prevent the conspiracy.

### 3.     Safe Harbor Statement

99.     Plaintiff's case is brought in good faith with the understanding conveyed by the unambiguous language of laws and/or case law. Notwithstanding the foregoing, it is entirely

possible that his reading of the law is mistaken and that it has become an accepted practice
to bribe elected politicians to resolve grievances by litigation eBay-style. In either case the
public has a vested interest – and a right – to know whether the law has changed, and
whether 42 U.S.C. 1985(2)(3) and 1986 no longer govern.

100.    To further clarify the tenor of this case, this action concerns solely the issue of
interference by elected officials and their co-conspirators with the judiciary by ex parte
contacts; in other words, it deals with their conspiracies for the purpose of blocking
plaintiff's meaningful access to courts.

**4.      Defendants' Obligation under the Law**

101.    The defendants had an obligation under the law to abstain from depriving plaintiff of
his equal protection, of his right to due process, and of his right to meaningful access to the
courts; in short, the defendants had an obligation under the law not to engage in a con-
spiracy to deprive plaintiff of his civil rights.

102.    Every one of the defendants herein was able to prevent such conspiracy, yet –
despite an obligation under the law – did nothing, to the contrary facilitated it.

103.    Defendants obligation is clearly defined in Title 42 U.S.C. 1983, 1985(2)(3), and
1986. The law is unambiguous:

**A.      42 U.S.C. 1983**
Every person who, under color of any statute, ordinance, regulation, custom, or
usage, of any State or Territory, subjects, or causes to be subjected, any citizen of
the United States or other person within the jurisdiction thereof to the deprivation of
any rights, privileges, or immunities secured by the Constitution and laws, shall be
liable to the party injured in an action at law, suit in equity, or other proper
proceeding for redress.

**B.      42 U.S.C. 1985 (2) Obstructing justice**
. . . if two or more persons conspire for the purpose of impeding, hindering,
obstructing, or defeating, in any manner, the due course of justice in any State or
Territory, with intent to deny to any citizen the equal protection of the laws . . .

**C.   42 U.S.C. 1985 (3) Depriving persons of rights or privileges**

If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, **any person or** class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . [I]n any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, **or deprived of having and exercising any right or privilege** of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators (emphasis supplied)

**D.    42 U.S.C. 1986. – Action for neglect to prevent**

Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action . . .

104.   Despite the unambiguous language of these statutes, the defendants – including parties, counsel, and elected officials -  either conspired to deprive plaintiff of his civil rights or – knowing that wrongs as defined by S. 1985 were about to be committed – abstained from preventing, or neglected to prevent such conspiracy.

**E.    Case Law relied upon**

105.   Plaintiff relies in part upon the following case law: BIVENS v. SIX UNKNOWN FED. NARCOTICS AGENTS, 403 U.S. 388 (1971); DENNIS v. SPARKS, 449 U.S. 24 (1980); KIMES v STONE 84 F.3d 1121 (9th Cir 1996); HADDLE v. GARRISON, 525 U.S. 121 (1998); CHRISTOPHER v HARBURY, 536 US 403 (2002).

106.   "It is beyond dispute that the right of access to the courts is a fundamental right protected by the Constitution." GRAHAM v. NATIONAL COLLEGIATE ATHLETIC ASS'N, 804

F.2d 953, 959 (6th Cir. 1986). The right of access to the courts finds support in several

provisions of the Constitution including: the Due Process Clause of the Fourteenth

Amendment, WOLFF v. MCDONNELL, 418 U.S. 539, 579 (1974), the Equal Protection Clause,

PENNSYLVANIA v. FINLEY, 481 U.S. 551, 557 (1987), the First Amendment, TURNER v.

SAFLEY, 482 U.S. 78, 84 (1987)(citing JOHNSON v. AVERY, 393 U.S. 482 (1969)), and the

Privileges and Immunities Clause of Article IV, see, e.g., CHAMBERS v. BALTIMORE & OHIO

R.R., 207 U.S. 142, 148 (1907); SMITH V. MASCHNER, 899 F.2d 940, 947 (10th Cir. 1990).

107.    Access to courts does not only protect one's right to physically enter the courthouse

halls, but also insures that the access to courts will be "adequate, effective and meaningful",

BOUNDS v. SMITH, 430 U.S. 817, 822 (1977).

108.    DAVIS v. PASSMAN, 442 U.S. 228 (1979): "A cause of action and damages remedy

can be implied directly under the Constitution when the Due Process Clause of the Fifth

Amendment is violated", citing BIVENS, ibid; BUTZ v. ECONOMOU, 438 U.S. 478, quoting

U.S. v. LEE, 106 U.S. [196,] 220 [(1882)]: "No man in this country is so high that he is

above the law. No officer of the law may set that law at defiance with impunity. All officers

of the government, from the highest to the lowest, are creatures of the law, and are bound

to obey it". DAVIS, ibid: "The Fifth Amendment provides that "[n]o person shall be . . .

deprived of life, liberty, or property, without due process of law . . . ."

109.    In numerous decisions, th[e Supreme] Court "has held that the Due Process Clause

of the Fifth Amendment forbids the Federal Government to deny [the] equal protection of

the laws. e. g., VANCE v. BRADLEY, 440 U.S. 93, 95 n. 1 (1979)", HAMPTON v. MOW SUN

WONG, 426 U.S. 88, 100 (1976); BUCKLEY v. VALEO, 424 U.S. 1, 93 (1976); WEINBERGER

v. WIESENFELD, 420 U.S. 636, 638 n. 2 (1975); BOLLING v. SHARPE, 347 U.S. 497, 500

(1954).

110.    Finally, in **FEDERAL PRESCRIPTION SERV., INC. v. AMERICAN PHARMA-**

**CEUTICAL ASS'N** , 663 F.2d 253, 263 (D.C. Cir. 1981), the Court of Appeals for the District

of Columbia held: "Attempts to influence governmental action through overtly corrupt

conduct, such as bribes (in any context) and misrepresentation (in the adjudicatory

process), are not normal and legitimate exercises of the right to petition, and activities of this sort have been held beyond the protection of Noerr".

### 5.    Privilege and Immunity

111.   It s settled that _judges_ are immune from liability for conduct executed under color of office, but such immunity does not cover co-conspirators (see KIMES ibid, DENNIS ibid).

112.   Elected officials, for example such as Senators [and Congressmen], enjoy immunity only for speech that is "essential to the deliberations of the Senate", see HUTCHINSON v. PROXMIRE 443 U.S. 111 (1979). Here, defendants' calling the judges to put pressure on them to block plaintiff's access to the courts was not part of the deliberative process....," it "was in no way essential to the deliberations of the Senate [or Congress]". To the contrary, the payment of money for such service was received for the specific purpose of funding the Senators and Congressman's re-election, a purely personal benefit.

113.   Next, neither the First Amendment nor Noerr-Pennington cover _conduct_ that includes a conspiracy to block meaningful access to the courts in deprivation of civil rights.

114.   Finally, state law does not provide privilege for conduct that includes a conspiracy to block meaningful access to the courts in deprivation of civil rights; or that is violative of the Supremacy clause, as has been held in GRITCHEN, ibid., and KIMES, ibid[9].

### 6.    Settlement Efforts

115.   Plaintiff or plaintiff's attorney have made numerous efforts to settle these cases. The defendants and/or the United States have adamantly refused to settle. In particular, Richard Greenfield has offered settlement to the Ziff defendants, albeit while the bribery scheme, unknown to plaintiff, was in progress; to no avail. Plaintiff has filed a Federal Tort Claim in 2002 that has not been answered as of this date. In the Sprint case, plaintiff has offered to settle. Sprint's attorneys have refused to settle. Therefore, no effective means other than provided by the judiciary are available to plaintiff.

---

[9] In a recent Supreme Court case, writing for the majority in TENNESSEE v. LANE, No. 02-1667, Justice John Paul Stevens said, "Ordinary considerations of cost and convenience cannot justify a state's failure to provide individuals with a meaningful right of access to the courts." It is settled that 'access' is not restricted to physically entering the court room (BOUNDS, 424 U.S. 1, 93 (1976)).

### 7.      Prayers

### COUNT 1: (Ziff Case) William Jefferson Clinton, Harold Ickes, Donald Fowler, Dirk Edward Ziff, Robert Ward, Mayer Brown

### Violation of 42 U.S.C. 1983, 1985 (2), and 1985(3)

116.   The allegations and facts described in section 2(A), §§ 30 through 44, supra, are incorporated herein by reference as if set forth with particularity.

117.   William Jefferson Clinton, Harold Ickes, Donald Fowler, all of which acting in their personal capacity; Dirk Edward Ziff, Robert Ward[10], Mayer Brown, and one or more John Does, whose identities are currently unknown, conspired to block plaintiff's access to the courts in violation of his civil rights by offering, paying, or accepting bribes quid pro quo for value, in particular as payment for Ickes' and/or other defendants' services consisting of calling the presiding judge in a federal lawsuit to put pressure on her to dismiss the case.

118.   For that purpose, Robert Ward, in or about November 1993, proposed to Dirk Ziff to use Mayer Brown's Lobbying arm and arrange access to elected officials, especially president Clinton.

119.   Following advise provided by Robert Ward and a John Doe, believed to be a lobbyist at Mayer Brown, on December 12, 1993 Dirk Edward Ziff purchased access to the president by payment of $100,000, as routinely demanded by Clinton and Ickes for such favors.

120.   On a day between January and September 1994 - the exact date as yet to be discovered – Dirk Edward Ziff met with William Jefferson Clinton and Harold Ickes, stayed over night at the Whitehouse, slept in the Lincoln bedroom, and had a follow-up meeting during which Dirk Ziff bemoaned the existence of plaintiff's lawsuit and requested interference with due process.

121.   Clinton and Ickes agreed to help and promised interference by ex parte contacts to the judge quid pro quo for further payments.

122.   Ziff agreed to the condition set by Clinton or Ickes.

---

[10] "Private persons, jointly engaged with state officials in the challenged action, are acting `under color' of law for purposes of Section 1983 actions." DENNIS, 449 U.S. at 27-28 (1980).

123    Plaintiff will prove at trial that Ickes, acting as agent for Clinton and the DNC, illegally collected bribes, disguised them as contributions for Clinton's re-election campaign, and directed such bribes to be paid to the DNC for the personal benefit of defendant Clinton.

124.    Plaintiff will further prove at trial that Clinton and/or Ickes contacted the presiding judge, believed to be an appointee of President Reagan, a staunch Republican who refused to budge. Thereafter Ickes contacted the Clerk of the District Court and demanded the case be transferred to Judge Denise Cote, a Clinton appointee.

125.    On September 21, 1994 the judge was replaced. Plaintiff will prove at trial that, three days later, on September, Dirk Ziff paid $100,000 upon instruction by Ickes in two checks of $37,500.00 and $62,500.00 respectively to the DNC. The amount arrived there, and was recorded, on September 27, 1994.

126.    Plaintiff will prove at trial that the DNC's fundraising activities were at all times material hereto a "joint venture" with the Whitehouse, and according to testimony of Fowler before Congress, for all practical purposes under operational control of Ickes[11].

127.    As the Ziff case progressed before the Southern District of New York, the judge, impressed by the involvement of high-ranking elected officials interfering on behalf of Ziff, instructed plaintiff that it was premature to argue conflict of laws issues[12], thereafter ordered a stay of discovery, denying plaintiff the opportunity to extract and submit evidence in the custody of Ziff, that would have provided proof of plaintiff's claims.

128.    Ziff followed with payments to the DNC upon instruction provided by Ickes in five installments, totaling $132.500.

129.    On November 20, 1995 the judge converted sua sponte a motion to dismiss into one for summary judgment, finding that plaintiff had not argued conflict of law issues, therefore

---

[11] Before being appointed to the position of Assistant to the President and Deputy Chief of Staff, Ickes managed the day-to-day business of the DNC.

[12] Since Redwood Press was located in Munich/Germany, the parties had expressly agreed to apply German law to govern the transaction. There are significant differences between German and United States law. Under German law, if the buyer does not pay, the statute of limitations is 30 years. Furthermore, transactions that are voidable give the seller the option to either return partial payments and demand return of all profits derived from the transaction, or waive the profits and keep the partial payments, in either case being entitled to the return of the property.

applying New York law; and further finding that plaintiff had not presented evidence to prove his case.

130.   Exactly three days later, Ziff mailed a check in the amount of $300,000 that was received by the DNC on November 28, 1995.

131.   Plaintiff appealed. Ziff paid another $28,500 to the DNC in eleven installments, as directed by Ickes. The appeal was dismissed.

132.   Plaintiff filed a Petition for Certiorari. Ziff paid another $10,000 in seven installments. The petition was denied.

133.   It was not until late 1999 that plaintiff became suspicious, and until 2000 that he found actionable evidence that statistically linked the payments to the timeline of the Ziff case. Following his discovery, on August 6, 1999 plaintiff filed an adversary proceeding against Ziff Davis Publishing Company and others in Bankruptcy Court for the Southern District of California, where his chapter 13 case was pending[13].

134.   No sooner was the action pending when Ziff renewed his payments to the DNC over the life of the proceeding, totaling another $186,000. When the adversary action was dismissed, Ziff's payment to the DNC stopped.

135.   Since defendants kept their ex parte contacts secret, plaintiff did not discover the circumstances of the $186,000 payments, and the involvement of parties other than Ziff, until May 4, 2004 when he investigated Sprint PAC activities recorded in the FEC data bases, came across the new Ziff evidence, and discovered Mayer Brown's lobbying arm's part.

136.   On February 20, 2001 plaintiff filed a criminal complaint with the Attorney General of the United States Mary Jo White, (tracking number EL058619305US) received on February 21, 2001 and signed for by a certain T. Brown. Brown's signature is in custody of plaintiff.

137.   Dirk Ziff promptly paid $10,000 (FEC # 21020081511) to the DNC.

---

[13] Ziff's fraudulent purchase of Redwood Press had stripped plaintiff of all assets and left him with debt, stemming from Ziff's fraudulent demand for advancement of operating costs pending payment of the purchase price. Out of these bank-financed advances alone, plaintiff as of this day is still saddled with a judgment over $60,000.

138.   Mary Jo White, a Clinton appointee, never responded, investigated, or even turned the matter over to the FBI for investigation.

139.   Having not heard from the District Attorney, on February 4, 2002 plaintiff filed a Tort Claim under 28 U.S.C. 2675(a) with the Whitehouse and the Department of Justice; neither responded.

140.   Plaintiff will prove at trial by witness testimony that the interplay between Clinton, Ickes, Fowler, Ward, Mayer Brown, and Ziff, as described here, was an orchestrated bribery scheme to which each participant had agreed, had either supplied the bribe, had accepted it, or had facilitated the payments between the actors.

141.   Plaintiff will prove at trial that the participants in the conspiracy knew that their actions were illegal. Ickes, when terminated as Deputy Chief of Staff, removed 50 boxes of evidence from the Whitehouse and on May 21, 1998 admitted in depositions before Judicial Watch attorney Klayman that he subsequently had disposed of evidence[14].

142.   Defendants' conduct was unlawful under 42 U.S.C. 1983, 1985(2), and 1985(3) and malicious under any legal standard.

143.   As a direct result of defendants' unlawful conduct, plaintiff's access to the courts was effectively blocked, his claims were never heard, and he was thus deprived (1) of the equal protection of the law available to all, (2) of meaningful access to the courts, (3) of the privileges and immunities granted to him under the Constitution, and (4) as a direct result suffered injury to his property in the amount of $2,000,000.

144.   Defendants Clinton, Ickes, Fowler, Ziff, Ward, and Mayer Brown, are jointly and severally liable to plaintiff for plaintiff's damages.

145.   WHEREFORE, PLAINTIFF PRAYS FOR JUDGMENT against William Jefferson Clinton, Harold McEwing Ickes, Donald Fowler, Dirk Edward Ziff, Robert Ward, Mayer Brown for

---

[14] Ickes claims that a mystery person of the Whitehouse Counsel's office gave him permission to remove the evidence, but could neither remember the color of her hair, the height of that person or any other characteristic that could have identified that person. It is therefore alleged that no personnel employed at the Whitehouse Counsel's office ever discussed the issue of removal of evidence with Ickes, or gave permission to remove any documents whatever. Ickes instead removed the files with knowledge of, and/or on instruction by Clinton.

actual damages in the amount of $2,000,000, and for punitive damages[15] in an amount to be determined by the jury, 80% of which shall be paid at the discretion of the Court to either a medical research organization or the District of Columbia; plus cost, and such other relief as the Court may deem just.

### COUNT 2: (Ziff Case) William Jefferson Clinton, Harold Ickes, Donald Fowler, Dirk Edward Ziff, Robert Ward, Mayer Brown

### Violation of 42 U.S.C. 1986

146.   William Jefferson Clinton, Harold Ickes, Donald Fowler, all of which acting in their personal capacity; Dirk Edward Ziff, Robert Ward, Mayer Brown, and one or more John Does, whose identities are currently unknown, conspired to block plaintiff's access to the courts.

147.   The facts alleged in Count 1 are incorporated herein by reference as if pleaded with particularity.

148.   The allegations and facts described in section 2(A) §§ 30 through 44 are incorporated herein by reference as if set forth with particularity.

149.   Each and every one of the defendants herein was under obligation pursuant to Title 42 U.S.C. 1986 to prevent the conspiracy, was capable of preventing, and had an opportunity to prevent it, but in fact neglected to prevent it.

150.   As a direct result of defendants' unlawful conduct, plaintiff's access to the courts was effectively blocked, his claims were never heard, and he was thus deprived (1) of the equal protection of the law available to all, (2) of meaningful access to the courts, (3) of the privileges and immunities granted to him under the Constitution, and (4) as a direct result suffered injury to his property in the amount of $2,000,000.

151.   Defendants Clinton, Ickes, Fowler, Ziff, Ward, and Mayer Brown, and one or more John Does are jointly and severally liable to plaintiff for plaintiff's damages.

---

[15] "Punitive damages are recoverable in sec. 1983 suit where defendant's conduct is motivated by an evil motive or intent, or where it involves reckless or callous indifference to plaintiff's federally protected rights", SMITH v. WADE, 461 U.S. 30, 50-51 ((1983);

152.   <u>WHEREFORE, PLAINTIFF PRAYS FOR JUDGMENT</u> against William Jefferson Clinton, Harold McEwing Ickes, Donald Fowler, Dirk Edward Ziff, Robert Ward, and Mayer Brown Rowe & Maw LLP for actual damages in the amount of $2,000,000, and for punitive damages in an amount to be determined by the jury, 80% of which shall be paid at the discretion of the Court to either a medical research organization or the District of Columbia; plus cost, and such other relief as the Court may deem just.

### **COUNT 3: (Ziff Case) William Jefferson Clinton, Harold Ickes, Donald L. Fowler, Dirk Edward Ziff**

### **Violation of 18 U.S.C. 1962(c)**

153.   <u>William Jefferson Clinton, Harold Ickes, Donald L. Fowler</u>, in their individual capacity, and <u>Dirk Edward Ziff</u>, in or about 1993 formed an enterprise as defined by 18 U.S.C. 1961 (4) for the purpose to conspire to engage in racketeering activities for the personal benefit of both William Jefferson Clinton, i.e. who received funds for his re-election to office, and Dirk Ziff who avoided a $2 million judgment.

154.   William Jefferson Clinton, Harold Ickes, Dirk Edward Ziff, Donald L. Fowler as members of that enterprise engaged in racketeering activities in violation of <u>18 U.S.C. 1962(c)</u>, by offering bribes in violation of Section 201(b)(1)(A), or accepting bribes in violation of Section 201(b)(2) et seq. of Title 18 U.S.C. quid pro quo for services the purpose of which was to influence the outcome of judicial proceedings.

155.   Once the herein named defendants had set up the enterprise, they in fact suborned the offering of, offered, and/or accepted, bribes in a pattern exceeding two years as outlined in the tables provided on pages 8 through 11, §§ 30 through 44 of this complaint.

156.   Such bribes were solicited by Harold Ickes, offered and paid by Dirk Edward Ziff and allies, including his brother Daniel Ziff, and by Ziff Brothers Investment [Company], accepted by Ickes for the benefit of then President Clinton's re-election, and paid on instruction of Ickes to the DNC, who received the illegal funds knowingly.

157.   The purpose of such bribes were to obtain from public officials, including William Jefferson Clinton and Harold Ickes, actions interfering with due process, and blocking of

plaintiff's meaningful access to the courts in the matters of Vongrabe v Ziff Davis Publishing Company before the Southern District of New York, and Vongrabe v. Ziff Davis Publishing Company before the Southern District of California.

158.    As telephone records will show, Ickes and/or agents of Ickes and/or William Jefferson Clinton in fact called the courts as promised.

### Habitual Pattern of Illegal Interference for Bribes

159.    The defendants have a propensity to illegally interfere with rights of others quid pro quo for payment of bribes. The following is but one other example of their mindset.

160.    The Chippewas Indian Tribe, the members of which subsist on an income of $6,000 per tribal member per year, sought a license for a gambling casino in Hudson.

161.    The members of the Shakopee Indian nation, who receive on average $396,700 from gaming revenue per year, opposed the Hudson casino. If the Hudson casino had been allowed, the Interior Department's analysis showed that that income - in a worst-case scenario - would have dropped to $363,900, a not insignificant loss but still a legacy of prosperity.

162.    In order to torpedo the Chippewa application, the Shakopee tribe paid $420,000, stemming from casino gambling revenues, upon instruction of Fowler and Ickes to the DNC for the re-election fund of Mr. Clinton, requesting through their attorney Patrick O'Connor that the Whitehouse interfere.

163.    The Shakopee tribe turned out to be the high bidder for Whitehouse favors, outbidding the $150,000 of the Chippewa tribe by a margin of almost three to one.

164.    To show a pattern, plaintiff will present witnesses that will testify that Messrs. Clinton, Fowler and Ickes called Bruce Babbitt, the Secretary of the Interior and interfered in the affairs of the Interior Department; they finally obtained a denial of the Chippewa application that flew into the face of the Department's own guide lines, and that ignored the recommendations of experts both in the Whitehouse and Interior Department.

165.    The evidence in the Indian tribe case proves that plaintiff's case is not an isolated incident but rather part of a racketeering pattern.

166.   William Jefferson Clinton, Harold Ickes, Donald L. Fowler are jointly and severally liable to plaintiff for treble damages according to <u>18 U.S.C. 1964</u>.

167.   <u>WHEREFORE PLAINTIFF PRAYS FOR JUDGMENT</u> against William Jefferson Clinton, Harold McEwing Ickes, Donald L. Fowler, and Dirk Edward Ziff trebling the damage award under any of the foregoing counts.

## COUNT 4: (Ziff Case) William Jefferson Clinton, Harold Ickes, Donald L. Fowler, Dirk Edward Ziff

### Violation of 18 U.S.C. 1962(d)

168.   <u>William Jefferson Clinton, Harold Ickes, Donald L. Fowler,</u> in their individual capacity, and <u>Dirk Edward Ziff,</u> in or about 1993 formed an enterprise as defined by 18 U.S.C. 1961 (4) for the purpose to engage in racketeering activities.

169.   Over a period exceeding two years the members of that enterprise **conspired** to engage in racketeering activities to the detriment of plaintiff in violation of <u>18 U.S.C. 1962(d)</u>, by offering bribes in violation of Section 201(b)(1)(A), or accepting bribes in violation of Section 201(b)(2) et seq. of Title 18 U.S.C. for the purpose to influence the outcome of judicial proceedings.

170.   Once the herein named defendants had set up the enterprise, they promptly suborned the offering of, or offered, and accepted, bribes in a pattern exceeding two years as outlined in the tables provided on pages 8 through 11 of this complaint.

171.   Such bribes were offered and paid by Dirk Edward Ziff and allies, including his brother Daniel Ziff, and by Ziff Brothers Investment [Company], accepted by Ickes for the benefit of then President Clinton's re-election, and paid on instruction of Ickes to the DNC.

172.   The purpose of such bribes were to obtain from public officials, including William Jefferson Clinton and Harold Ickes, actions interfering with due process, and blocking of plaintiff's meaningful access to the courts in the matters of Vongrabe v Ziff Davis Publishing Company before the Southern District of New York, and Vongrabe v. Ziff Davis Publishing Company before the Southern District of California.

173.    As telephone records will show, Ickes and/or agents of Ickes and William Jefferson Clinton in fact called the courts as promised.

174.    The conspiracy within the meaning of 18 U.S.C. 1962(d) is independently actionable; William Jefferson Clinton, Harold Ickes, and Donald L. Fowler are jointly and severally liable to plaintiff for treble damages according to 18 U.S.C. 1964.

175.    WHEREFORE PLAINTIFF PRAYS FOR JUDGMENT AGAINST William Jefferson Clinton, Harold McEwing Ickes, Dirk Edward Ziff, and Donald L. Fowler trebling any damage award under any of the foregoing counts.

## Count 5: (Ziff Case) William Jefferson Clinton, Harold Ickes, Donald L. Fowler, Dirk Edward Ziff

### Intentional Infliction of Emotional Distress

176.    Defendants Clinton, Ickes, Fowler, Ward, Ziff, and Mayer Brown intentionally and deliberately inflicted emotional distress on plaintiff by maliciously interfering with his civil rights and conspiring against him, thereby destroying his trust in the judicial system.

177.    Defendants' conduct was extreme, outrageous, and malicious, beyond all possible bounds of decency, and utterly intolerable in a civilized community.

178.    The actions of the Defendants were the cause of plaintiff's emotional and physical distress.

179.    Plaintiff is a reasonable man.

180.    The emotional distress sustained by plaintiff was severe and of a nature that no reasonable man could be expected to endure. His physical pain was caused by stress-induced ischemia that in turn was directly caused by defendants' callous, self-serving conduct resulting in plaintiff and his family becoming paupers overnight.

181.    As a result of the Defendants' extreme and outrageous conduct, plaintiff has suffered and with a high degree of likelihood, will continue to suffer mental pain and anguish, embarrassment, humiliation that he was so betrayed by the judicial system, and severe emotional trauma.

182.    <u>WHEREFORE PLAINTIFF PRAYS FOR JUDGMENT</u> against William Jefferson Clinton,

Harold McEwing Ickes, Donald L. Fowler, Dirk Edward Ziff, Robert Ward, and Mayer Brown

jointly and severally in the amount of $5,000,000.

### COUNT 6: (Sprint Case) Dianne Feinstein, Julie Zamarripa, Daniel Pascucci,

### Darren Weingard

### Violation of 42 U.S.C. 1983, 1985(2), and 1985(3)

183.    <u>Dianne Feinstein</u>, in her individual capacity, <u>Julie Zamarripa, Daniel Pascucci, Darren</u>

<u>Weingard</u>, and one or more John Does, whose identities are currently unknown, but who are

alleged to be employee(s), or agent(s), of Sprint PAC, conspired under color of law to block

plaintiff's meaningful access to the courts in violation of plaintiff's civil rights by offering

and/or accepting bribes quid pro quo for calling a federal judge, and, with the weight of the

office of the Senator, bringing pressure on federal judges to dismiss a meritorious case

brought by plaintiff.

184.    The facts alleged in Section 2(B)(v), §§ 71 – 81 and 93 - 98, are incorporated herein

by reference as if set forth with particularity.

185.    The defendants named herein in Count 6 had an obligation under the law to abstain

from conspiring to violate plaintiff's civil rights.

186.    Plaintiff will prove at trial that, notwithstanding such obligation, the defendants

named in Count 6 conspired with each other to offer and accept bribes, disguised as

campaign contribution, quid pro quo for favors. In particular the defendants conspired to

block plaintiff's meaningful access to the courts. For that purpose, Senator Feinstein in or

about June 2003 called Magistrate Judge Stiven of the Southern District of California, and in

February or March 2004 Judge Alsup of the Northern District, demanding under power of her

office that the judges enter judgment in favor of the Sprint defendants.

187.    The judges – consciously or subconsciously - were influenced by the Senator's calls;

Judge Stiven overturned dozens of precedents as described supra in §§ 78 through 85, and

ruled against plaintiff despite an ironclad case. Judge Alsup, under the impression of the

Senator's call, in open court and on the record admonished plaintiff for complaining about

Pascucci perjurious conduct, and put on the record that plaintiff could not expect a fair trial before him.

188.    As a direct result of defendants' unlawful conduct, plaintiff's access to the courts was effectively blocked, his claims were never heard, and he was thus deprived (1) of the equal protection of the law available to all, (2) of meaningful access to the courts, (3) of the privileges and immunities granted to him under the Constitution, and (4) as a direct result suffered injury to his property in the amount of $540,000.

189.    Plaintiff's damages were the direct result of defendants' conduct, consisted among others of over 5,400 hours spent in preparing the case for trial that are for naught, which plaintiff could have used profitably otherwise; and the expense and time required to pursue appellate litigation. Defendants are jointly and severally liable to plaintiff for plaintiff's damages.

190.    WHEREFORE PLAINTIFF PRAYS FOR JUDGMENT against Dianne Feinstein, in her individual capacity, Julie Zamarripa, Darren S. Weingard, and one or more John Does, for actual damages in the amount of $540,000 equivalent to $100 per hour, and for punitive damages in an amount to be determined by the jury, 80% of which shall be paid at the discretion of the Court to either a medical research organization or the District of Columbia; plus cost, and such other relief as the Court may deem just.

### COUNT 7: (Sprint Case) Dianne Feinstein, Julie Zamarripa, Daniel Pascucci, Darren Weingard

### Violation of 42 U.S.C. 1986

191.    Dianne Feinstein, in her individual capacity, Julie Zamarripa, Daniel Pascucci, Darren Weingard, and one or more John Does, whose identities are currently unknown, but who are alleged to be employee(s), or agent(s), of Sprint PAC, conspired under color of law to block plaintiff's meaningful access to the courts in violation of plaintiff's civil rights by offering and/or accepting bribes quid pro quo for calling a federal judge, and, with the weight of the office of the Senator, bringing pressure on federal judges to dismiss a meritorious case brought by plaintiff.

192.   The facts alleged in Section 2(B)(v), §§ 52 – 98 supra, are incorporated herein by reference as if set forth with particularity.

193.   The defendants named in Count 7 had an obligation under 42 U.S.C. 1986 not only to abstain from conspiring to violate plaintiff's civil rights, but had an affirmative obligation to prevent the said conspiracy. They neglected to prevent it.

194.   As a direct result of defendants' unlawful conduct, plaintiff's access to the courts was effectively blocked, his claims were never heard, and he was thus deprived (1) of the equal protection of the law available to all, (2) of meaningful access to the courts, (3) of the privileges and immunities granted to him under the Constitution, and (4) as a direct result suffered injury to his property in the amount of $540,000.

195.   Plaintiff's damages were the direct result of defendants' conduct, consist of (1) over 5,400 hours spent in preparing the case for trial that are for naught, and that plaintiff could have used profitably otherwise; and (2) the expense and time required to pursue appellate litigation.

196.   WHEREFORE PLAINTIFF PRAYS FOR JUDGMENT against Dianne Feinstein, in her individual capacity, Julie Zamarripa, Darren S. Weingard, and one or more John Does, for actual damages in the amount of $540,000, and for punitive damages in an amount to be determined by the jury, 80% of which shall be paid at the discretion of the Court to either a medical research organization or the District of Columbia; plus cost, and such other relief as the Court may deem just.

## COUNT 8: (Sprint Case) Barbara Boxer, Julie Zamarripa, Daniel Pascucci, Darren Weingard

### Violation of 42 U.S.C. 1983, 1985(2), and 1985(3)

197.   Barbara Boxer, in her individual capacity, Julie Zamarripa, Daniel Pascucci, Darren Weingard, and one or more John Does, whose identities are currently unknown, but who are alleged to be employee(s), or agent(s), of Sprint PAC, conspired under color of law to block plaintiff's meaningful access to the courts in violation of plaintiff's civil rights by paying and/or accepting bribes quid pro quo for calling a federal judge, and, with the weight of the

office of the Senator, bringing pressure on federal judges to dismiss a meritorious case brought by plaintiff.

198.    The facts alleged in Section 2(B)(v) , §§ 52 – 98 supra, are incorporated herein by reference as if set forth with particularity.

199.    The defendants named in Count 8 had an obligation under the law to abstain from conspiring to violate plaintiff's civil rights.

200.    Plaintiff will prove at trial that notwithstanding such obligation, the Senator conspired with Sprint PAC, a Sprint PAC John Doe, and Julie Zamarripa by accepting the bribe, disguised as campaign contribution quid pro quo or calling a judge. She in fact called Judge Stiven demanding under the power of her office that the judges enter judgment in favor of the Sprint defendants and to the detriment of plaintiff.

201.    The judge – consciously or subconsciously - was influenced by the Senator's call.

202.    As a direct result of defendants' unlawful conduct, plaintiff's access to the courts was effectively blocked, his claims were never heard, and he was thus deprived (1) of the equal protection of the law available to all, (2) of meaningful access to the courts, (3) of the privileges and immunities granted to him under the Constitution, and (4) as a direct result suffered injury to his property in the amount of $540,000, consisting of 5400 hours spend in preparing the case for trial, time that could have been used profitably otherwise.

203.    Defendants are jointly and severally liable to plaintiff for plaintiff's damages.

204.    <u>WHEREFORE PLAINTIFF PRAYS FOR JUDGMENT</u> against Barbara Boxer, in her individual capacity, Julie Zamarripa, Darren S. Weingard,  and one or more John Does, for actual damages in the amount of $540,000, and for punitive damages in an amount to be determined by the jury, 80% of which shall be paid at the discretion of the Court to either a medical research organization or the District of Columbia; plus cost, and such other relief as the Court may deem just.

## COUNT 9: (Sprint Case) Barbara Boxer, Julie Zamarripa, Daniel Pascucci, Darren Weingard

### Violation of 42 U.S.C. 1986

205.   Barbara Boxer, in her individual capacity, Julie Zamarripa, Daniel Pascucci, Darren Weingard, and one or more John Does, whose identities are currently unknown, but who are alleged to be employee(s), or agent(s), of Sprint PAC, conspired under color of law to block plaintiff's meaningful access to the courts in violation of plaintiff's civil rights by paying and/or accepting bribes quid pro quo for calling a federal judge, and, with the weight of the office of the Senator, bringing pressure on federal judges to dismiss a meritorious case brought by plaintiff.

206.   The facts alleged in Section 2(B)(v) , §§ 52 – 98 supra, are incorporated herein by reference as if set forth with particularity.

207.   The defendants named in Count 9 had an obligation under 42 U.S.C. 1986 not only to abstain from conspiring to violate plaintiff's civil rights, but had an affirmative obligation to prevent the said conspiracy. They also had the capability and opportunity, but neglected to prevent it.

208.   As a direct result of defendants' unlawful conduct, plaintiff's access to the courts was effectively blocked, his claims were never heard, and he was thus deprived (1) of the equal protection of the law available to all, (2) of meaningful access to the courts, (3) of the privileges and immunities granted to him under the Constitution, and (4) as a direct result suffered injury to his property in the amount of $540,000, consisting of 5400 hours spend in preparing the case for trial, time that could have been used profitably otherwise.

209.   Defendants are jointly and severally liable to plaintiff for plaintiff's damages.

210.   WHEREFORE PLAINTIFF PRAYS FOR JUDGMENT against Barbara Boxer, in her individual capacity, Julie Zamarripa, Darren S. Weingard, and one or more John Does, for actual damages in the amount of $540,000, and for punitive damages in an amount to be determined by the jury, 80% of which shall be paid at the discretion of the Court to either a

medical research organization or the District of Columbia; plus cost, and such other relief as the Court may deem just.

### COUNT 10: (Sprint Case) Darrell Issa,, Julie Zamarripa, Daniel Pascucci, Darren Weingard

### Violation of 42 U.S.C. 1983, 1985(2), and 1985(3)

211.   Darrell Issa, in his individual capacity, Julie Zamarripa, Daniel Pascucci, Darren Weingard, and one or more John Does, whose identities are currently unknown, but who are alleged to be employee(s), or agent(s), of Sprint PAC, conspired under color of law, or otherwise, to block plaintiff's meaningful access to the courts in violation of plaintiff's civil rights by paying and/or accepting bribes quid pro quo for calling a federal judge, and, with the weight of the office of the Congressman, bringing pressure on the judge to dismiss a meritorious case brought by plaintiff.

212.   The facts alleged in Section 2(B)(v) , §§ 93 – 98 supra, are incorporated herein by reference as if set forth with particularity.

213.   The defendants named in Count 10 had an obligation under the law to abstain from conspiring to violate plaintiff's civil rights.

214.   Plaintiff will prove at trial that notwithstanding such obligation, the Congressman accepted the bribe, disguised as campaign contribution quid pro quo for calling a judge, The Congressman in fact called Judge Stiven demanding under the power of his office that the judges enter judgment in favor of the Sprint defendants.

215.   As a result, the judge – consciously or subconsciously - was influenced by the Congressman's call

216.   As a direct result of defendants' unlawful conduct, plaintiff's access to the courts was effectively blocked, his claims were never heard, and he was thus deprived (1) of the equal protection of the law available to all, (2) of meaningful access to the courts, (3) of the privileges and immunities granted to him under the Constitution, and (4) as a direct result suffered injury to his property in the amount of $540,000, consisting of 5400 hours spend in preparing the case for trial, time that could have been used profitably otherwise.

217.   Defendants are jointly and severally liable to plaintiff for plaintiff's damages.

218.   <u>WHEREFORE PLAINTIFF PRAYS FOR JUDGMENT</u> against Darrell Issa, in his individual capacity, Julie Zamarripa, Darren S. Weingard, and one or more John Does, for actual damages in the amount of $540,000, and for punitive damages in an amount to be determined by the jury, 80% of which shall be paid at the discretion of the Court to either a medical research organization or the District of Columbia; plus cost, and such other relief as the Court may deem just.

### COUNT 11: (Sprint Case) Darrell Issa,, Julie Zamarripa, Daniel Pascucci, Darren Weingard

### Neglect to Prevent Conspiracy (42 U.S.C. 1986)

219.   <u>Darrell Issa</u>, in his individual capacity, <u>Julie Zamarripa, Daniel Pascucci, Darren Weingard</u>, and one or more John Does, whose identities are currently unknown, but who are alleged to be employee(s), or agent(s), of Sprint PAC, conspired to block plaintiff's meaningful access to the courts in violation of plaintiff's civil rights by paying and/or accepting bribes quid pro quo for calling a federal judge, and, with the weight of the office of the Congressman, bringing pressure on the judge to dismiss a meritorious case brought by plaintiff.

220.   The facts alleged in Section 2(B)(v) , §§ 93 – 98 supra, are incorporated herein by reference as if set forth with particularity.

221.   The defendants named in Count 11 had an obligation under <u>42 U.S.C. 1986</u> not only to abstain from conspiring to violate plaintiff's civil rights, but had an affirmative obligation to prevent the said conspiracy. They also had the capability and opportunity, yet neglected to prevent it.

222.   As a result, the judge – consciously or subconsciously - was influenced by the Congressman's call.

223.   As a direct result of defendants' unlawful conduct, plaintiff's access to the courts was effectively blocked, his claims were never heard, and he was thus deprived (1)  of the equal protection of the law available to all, (2) of meaningful access to the courts, (3) of the

privileges and immunities granted to him under the Constitution, and (4) as a direct result suffered injury to his property in the amount of $540,000, consisting of 5400 hours spend in preparing the case for trial, time that could have been used profitably otherwise.

224.   Defendants are jointly and severally liable to plaintiff for plaintiff's damages.

225.   <u>WHEREFORE PLAINTIFF PRAYS FOR JUDGMENT</u> against Darrell Issa, in his individual capacity, Julie Zamarripa, Darren S. Weingard, and one or more John Does, for actual damages in the amount of $540,000, and for punitive damages in an amount to be determined by the jury, 80% of which shall be paid at the discretion of the Court to either a medical research organization or the District of Columbia; plus cost, and such other relief as the Court may deem just.

## <u>COUNT 12: Pascucci, Weingard, Zamarripa, Forsee</u>
## <u>(42 U.S.C. 1986)</u>

226.   The facts alleged in §§ 52 – 98 supra, are incorporated by reference as if set forth herein with particularity.

227.   The facts alleged in Counts 6 through 11 are incorporated by reference as if set forth herein with particularity.

228.   Defendants Pascucci, Weingard, Zamarripa, and Forsee knew of the conspiracy described in §§ 52 through 98.

229.   Defendants Pascucci, Weingard, Zamarripa, and Forsee had an obligation under 42 U.S.C. 1986 to prevent said conspiracy.

230.   Despite their obligation to prevent a 42 U.S.C. 1985(2) or (3) conspiracy they neglected to prevent it.

231.   The neglect of defendants Pascucci, Weingard, Zamarripa, and Forsee has caused plaintiff significant damages, the extent to be determined by the jury.

232.   Defendants Pascucci, Weingard, Zamarripa, and Forsee are jointly and severally liable to plaintiff for such damages.

233.   WHEREFORE PLAINTIFF PRAYS FOR JUDGMENT AGAINST defendants Pascucci, Weingard, Zamarripa, and Forsee in an amount to be determined by the jury of their peers.

## **COUNT 13: Robert Ward/Mayer Brown**

## **Neglect to Prevent Conspiracy (42 U.S.C. 1986)**

234.   The allegations and facts described in section 2(A), §§ 30 – 44 supra, are incorporated herein by reference as if set forth with particularity.

235.   Robert Ward and the partners at Mayer Brown had an obligation under 42 U.S.C. 1986 to prevent the described conspiracy.

236.   They did not; instead they participated in the described conspiracy by providing advice and connections to the Whitehouse to Dirk Edward Ziff.

237.   Robert Ward and Mayer Brown, having been part of the described conspiracy, are jointly and severally liable to plaintiff.

238.   Plaintiff's damage consists of the lost sales price for his company and is the direct result of Ward's and Mayer Brown's violation of the law.

239.   WHEREFOR PLAINTIFF PRAYS FOR JUDGMENT against Robert Ward and Mayer Brown for actual damages in the amount of $2,000,000.00, and for punitive damages in an amount to be determined by the jury, 80% of which shall be paid at the discretion of the Court to either a medical research organization or the District of Columbia; plus cost, and such other relief as the Court may deem just.

## **COUNT 14: Fish & Richardson Partners**

## **Neglect to Prevent Conspiracy (42 U.S.C. 1986)**

240.   The allegations and facts described in section 2(B)(v) §§ 52 – 98 supra, are incorporated herein by reference as if set forth with particularity.

241.   Daniel Pascucci admitted that his partners at Fish & Richardson at all times material hereto knew about the involvement of Pascucci in a conspiracy to obstruct justice, and to deprive plaintiff of his civil rights.

242.   Pascucci and the partners of Fish & Richardson had an obligation under 42 U.S.C. 1986 to prevent Pascucci's involvement in, as well as to prevent, the conspiracy.

243.   The partners of Fish & Richardson, despite their obligation under the law did not prevent. They are therefore jointly and severally liable to plaintiff.

244.   Plaintiff's damage consists of the lost time spent on preparing the Sprint case for trial; that effort proved fruitless as a direct result of Fish & Richardson's failure to intervene in Pascucci's conspiracy to block plaintiff's access to the courts.

245.   WHEREFOR PLAINTIFF PRAYS FOR JUDGMENT against Fish & Richardson for actual damages in the amount of $540,000, and for punitive damages in an amount to be determined by the jury, 80% of which shall be paid at the discretion of the Court to either a medical research organization or the District of Columbia; plus cost, and such other relief as the Court may deem just.

### COUNT 15: Fish & Richardson Partners

### Intentional or Negligent Infliction of Emotional Distress

246.   The partners of Fish & Richardson, defendants Pascucci, Weingard, Zamarripa, and Forsee intentionally or negligently inflicted emotional distress on plaintiff by interfering with his civil rights, by conspiring against him, and/or be neglecting to prevent a conspiracy to interfere with plaintiff's civil rights, thereby destroying his trust in the judicial system.

247.   Defendants' conduct was extreme, outrageous, and malicious, beyond all possible bounds of decency and utterly intolerable in a civilized community.

248.   The actions of the Defendants were the cause of plaintiff's distress.

249.   Plaintiff is a reasonable man.

250.   The emotional distress sustained by plaintiff was severe and of a nature that no reasonable man could be expected to endure.

251.   As a result of the Defendants' extreme, outrageous, and malicious conduct, plaintiff has suffered, and with a high degree of likelihood will continue to suffer, mental pain and anguish, embarrassment, humiliation that he was so betrayed by the judicial system, and severe emotional trauma.

252.   WHEREFORE PLAINTIFF PRAYS FOR JUDGMENT against the defendants, the partners of Fish & Richardson in the amount of $5,000,000.00.

## COUNT 16: Dianne Feinstein, Barbara Boxer, Darrell Issa, Julie Zamarripa
### Injunctive Relief

253.　Dianne Feinstein, Barbara Boxer, Darrell Issa, Julie Zamarripa, and one or more John

Does, whose identities are currently unknown, but who are alleged to be employee(s), or

agent(s), of Sprint PAC, conspired to block plaintiff's meaningful access to the courts in

violation of plaintiff's civil rights by paying and/or accepting bribes quid pro quo for calling a

federal judge, and, with the weight of the offices of the Senators and Congressman, bringing

pressure on the judge to dismiss a meritorious case brought by plaintiff.

254.　The allegations and facts described in section 2(B)(v) §§ 52 – 98 supra, are

incorporated herein by reference as if set forth with particularity.

255.　Plaintiff has an absolute right to access the courts.

256.　The defendants named in Count 16 are prohibited from putting pressure onto the

judiciary to influence the outcome of litigation under the Separation of Powers doctrine

established in the Constitution, and by other statute, including 42 U.S.C. 1983, 1985, 1986.

257.　There is no guarantee that even following a judgment favorable to plaintiff the

defendants will abstain from violating the law. To the contrary, defendants, with a

probability bordering on certainty, will interfere with due process rights of plaintiff and other

parties as soon as they have the opportunity to collect sums of money in return for granting

favors as described herein.

258.　Therefore, in the interest of preventing future misconduct to the detriment of the

public, plaintiff, and other litigants the Court should provide injunctive relief.

259.　WHEREFORE PLAINTIFF PRAYS FOR INJUNCTIVE RELIEF prohibiting defendants from

further interference in plaintiff's legal matters at penalty of $50,000 per incident.

### COUNT 17: Sprint Corporation Political Action Committee
### (42 U.S.C. 1985, 1986)

260.　The allegations and facts described in section 2(B)(v) §§ 52 – 98 supra, are

incorporated herein by reference as if set forth with particularity.

261.    The facts alleged in Counts 6 through 11 are incorporated by reference as if set forth herein with particularity.

262.    Sprint Corporation's Political Action Committee has been formed for the sole purpose to obtain favors from elected officials, quid pro quo for payment of sums of money.

263.    Sprint PAC routinely engages in bribery of elected officials.

264.    Sprint PAC, among many other incidents,  has paid money to Senators Feinstein and Boxer, and Congressman Issa in return for the favor to call federal judges on at least three occasions for the purpose to influence the outcome of litigation.

265.    As planned and requested by Weingard, and one or more John or Jane Does, employees of Sprint PAC, the elected officials have in fact called federal judges and successfully influenced the outcome of litigation in favor of Sprint.

266.    Sprint PAC's conduct has caused injury to plaintiff's property and has violated plaintiff's civil rights.

267.    Sprint PAC and its employees had a legal obligation to prevent a conspiracy or to abstain from participating in such conspiracy.

268.    Sprint PAC has supplied the funds that were used in a conspiracy to deprive plaintiff of his civil rights and therefore has participated in the conspiracy.

269.    Sprint PAC is liable to plaintiff for all damages caused by its conduct.

270.  · WHEREFORE PLAINTIFF PRAYS FOR JUDGMEN AGAINST SPRINT PAC in an amount to be determined by the jury.

### COUNT 18: Sprint Corporation Political Action Committee

### Intentional or Negligent Infliction of Emotional Distress

271.    Sprint PAC and its employees intentionally or negligently inflicted emotional distress on plaintiff by interfering with his civil rights, by conspiring against him, and/or be neglecting to prevent a conspiracy to interfere with plaintiff's civil rights, thereby destroying his trust in the judicial system.

272.    Defendants' conduct was extreme, outrageous, and malicious, beyond all possible bounds of decency and utterly intolerable in a civilized community.

273.   The actions of the Defendants were the cause of plaintiff's distress.

274.   Plaintiff is a reasonable man.

275.   The emotional distress sustained by plaintiff was severe and of a nature that no reasonable man could be expected to endure.

276.   As a result of the Defendants' extreme, outrageous, and malicious conduct, plaintiff has suffered, and with a high degree of likelihood will continue to suffer, mental pain and anguish, embarrassment, humiliation that he was so betrayed by the judicial system, and severe emotional trauma.

277.   WHEREFORE PLAINTIFF PRAYS FOR JUDGMENT AGAINST SPRINT PAC in the amount of $5,000,000.00.

### 8.   Demand for Jury Trial

278.   Plaintiff demands trial by Jury.

Respectfully submitted this 31st day of May, 2004

_____

Bernt Walther von Grabe, Plaintiff

## TABLE OF AUTHORITIES RELIED ON

BIVENS v. SIX UNKNOWN FED. NARCOTICS AGENTS, 403 U.S. 388 (1971)                     26,27

BOLLING v. SHARPE, 347 U.S. 497 (1954)                                              27

BOUNDS v. SMITH, 430 U.S. 817 (1977)                                               27,28

BUCKLEY v. VALEO, 424 U.S. 1, 93 (1976)                                         28 FN 9

BUTZ v. ECONOMOU, 438 U.S. 478                                                      27

CALIFORNIA MOTOR TRANSPORT v TRUCKING UNLIMITED, 404 U.S. 508 (1972)                23

CHABNER v. UNITED OF OMAHA LIFE INS. CO, 225 F.3d 1042, C.A.9 (Cal.), 2000          21

CHAMBERS v. BALTIMORE & OHIO R.R., 207 U.S. 142 (1907)                              27

CHRISTOPHER v HARBURY, 536 US 403 (2002)                                            26

DAVIS v. PASSMAN, 442 U.S. 228 (1979)                                               27

DENNIS v. SPARKS, 449 U.S. 24 (1980)                                          23,26,28,29
                                                                                  FN10

FEDERAL PRESCRIP. SERV., INC. v. AMERICAN PHARMAC. ASS'N , 663 F.2d 253 (D.C. Cir. 1981)   27

GRAHAM v. NATIONAL COLLEGIATE ATHLETIC ASS'N, 804 F.2d 953, 959 (6th Cir. 1986)     26

HADDLE v. GARRISON, 525 U.S. 121 (1998)                                             26

HAMPTON v. MOW SUN WONG, 426 U.S. 88, 100 (1976)                                    27

HUTCHINSON v. PROXMIRE 443 U.S. 111 (1979)                                          28

JOHNSON v. AVERY, 393 U.S. 482 (1969)                                               27

KIMES v STONE 84 F.3d 1121 (9th Cir 1996)                                        23,26,28

KNEVELBAARD DAIRIES v. KRAFT FOODS, INC., 232 F.3D 979, (C.A.9 (Cal.),2000)         21

NAACP v. BUTTON, 371 U.S. 415                                                       23

PENNSYLVANIA v. FINLEY, 481 U.S. 551 (1987)                                         27

SALINAS v. U.S. 118 S.Ct. 469 (U.S.Tex.,1997), 522 U.S. 52                          20

SMITH V. MASCHNER, 899 F.2d 940 (10th Cir. 1990)                                    27

TURNER v. SAFLEY, 482 U.S. 78 (1987)                                                27

U.S. v. LEE, 106 U.S. 196 [(1882)                                                   27

UNITED MINE WORKERS v. GIBBS, 383 U.S. 715 (1966)                                    3

VANCE v. BRADLEY, 440 U.S. 93 (1979)                                                27

WEINBERGER v. WIESENFELD, 420 U.S. 636 (1975)                                       27

WOLFF v. MCDONNELL, 418 U.S. 539 (1974)                                             27

## VERIFICATION

I, BERNT VONGRABE, a citizen of the State of Florida, hereby verify under penalty of perjury

under the laws of the United States of America, that the foregoing statements of laws and

facts are true and correct where they are based upon my own knowledge, and where

otherwise indicated are based upon information and belief. My statements are submitted

pursuant to 28 U.S.C. 1746(1).

This 31st day of May, 2004

_____

Bernt Walther von Grabe

## CERTIFICATE OF SERVICE

I, the undersigned, certify and declare that I am over the age of 18 years, and not a party to the above-entitled action.

On JUNE 1st 2004, I mailed the original and one true copy of the

(1)   VERIFIED COMPLAINT UNDER 42 U.S.C. § 1983 FOR DEPRIVATION OF CIVIL RIGHTS, §§ 1985(2), 1985(3), §1986, CONSPIRACY, COMMON-LAW CONSPIRACY, AND EMOTIONAL DISTRESS

(2)   CIVIL COVER SHEET

(3)   MONEY ORDER IN THE AMOUNT OF $150.

to the United States District Court for the District of Columbia,

☐   by placing the above into the custody of the United States Postal Service, Priority Mail, Tracking Number 03032460000226344984, postage prepaid

I declare under penalty of perjury that the above is true and correct.

Executed this 1st DAY OF JUNE 2004

Alyson von Grabe

887 Sugarhouse Ct

Port Orange, FL 32129

United States Postal Service®
DELIVERY CONFIRMATION™

0303 2460 0002 2634 4984

COMPLAINT DC                           PROOF OF SERVICE